Melvin Leroy TYLER; Frank Kevin Pool; George Thorn; Vincecca Vallard; Jerry Jones; Mark Hamilton; Jack Morgan and McKinley Robinson, Appellees,

v.

Dr. Leroy BLACK and Donald Wyrick, Appellants.

Melvin Leroy TYLER; Frank Kevin Pool; George Thorn; Vincecca Vallard; Jerry Jones; Mark Hamilton; Jack Morgan and McKinley Robinson, Appellants,

v.

Dr. Leroy BLACK and Donald Wyrick, Appellees.

Nos. 86-1043, 86-1044.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1986.

Decided Feb. 6, 1987.

David Kite, Jefferson City, Mo., for appellants.

Deborah Neff, Asst. Atty. Gen., Jefferson City, Mo., for appellees.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and STROM, District Judge.*

HENLEY, Senior Circuit Judge.

This appeal results from the district court's partial denial of permanent injunctive and declaratory relief. Appellants, inmates at the Missouri State Penitentiary (MSP), brought this suit under 42 U.S.C. § 1983 making constitutional challenges to certain conditions and procedures at the Special Management Facility (SMF), once known as Special Management Unit (SMU). Appellee Black is Director of the Missouri Department of Corrections, and appellee

---

* The Honorable Lyle E. Strom, United States District Judge, District of Nebraska, sitting by designation.

Wyrick is the Warden of MSP.[1] We affirm in part, reverse in part, and remand with instructions.

## I. BACKGROUND.

Although factual details may be recited where necessary, initially we will review only generally the history of SMF and this case. SMF is a segregation unit within MSP. It is made up of a new building, Housing Unit 5C, and a remodeled existing building, Housing Units 5A and 5B. Housing Unit 5C contains Level I, the most restrictive level of confinement in SMF. Housing Units 5A and 5B contain Levels II and III respectively, which are progressively less restrictive. Level I was opened with a transfer of inmates on February 8, 1982. Levels II and III were opened with a mass transfer of inmates on July 26, 1982. The move to Levels II and III was made earlier than scheduled due to perceived growing tension in MSP. Warden Wyrick felt that the potential for mass violence was substantial and he felt that the move to Levels II and III was the only way to control the situation. SMF's purpose is to serve as housing for administrative and disciplinary segregation of inmates from the general prison population.

Appellants filed this suit on August 6, 1982, challenging numerous conditions and procedures at SMF. Appellants subsequently made a motion for preliminary injunctive relief on their claims. Following a hearing, the United States Magistrate issued a thorough and well-reasoned Report and Recommendation on September 1, 1983, recommending that appellants' motion for preliminary injunctive relief be granted in part and denied in part. The magistrate's Report and Recommendation was adopted by the district court and judgment entered accordingly. Our court af-

firmed. *See Tyler v. Black*, 744 F.2d 610, 611–12 (8th Cir.1984).

Following hearing on the merits, the magistrate issued another thorough and well-reasoned Report and Recommendation on September 26, 1985, recommending that the requested permanent injunctive and declaratory relief be granted in part and denied in part. In an order dated December 17, 1985, the district court adopted the magistrate's Report and Recommendation with one modification. These appeals followed.

Appellants challenge the district court's denial of relief on the following claims: (1) due process violations in the original July 26, 1982 mass transfer of inmates to SMF and in SMF's present transfer and review procedures; (2) denial of access to the courts; and (3) eighth amendment violations in insufficient recreation opportunities in all Levels, and in double celling and the use of "boxcar" doors in Level I.

Pursuant to Fed.R.Civ.P. 52(a), we are bound by the factual findings of the magistrate and district court unless they are clearly erroneous. In order to hold that a finding of fact is clearly erroneous, we must be " 'left with the definite and firm conviction that a mistake has been committed,' " and we cannot reverse simply because we would have decided the case differently. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We note that although the standards for permanent injunctive and declaratory relief are different than those for preliminary injunctive relief, on issues where appellants presented no new evidence at the permanent injunctive and declaratory relief hearing, we will consider

1. Records indicate that defendants Black and Wyrick filed a notice of appeal in No. 86–1043 on January 8, 1986. Plaintiffs Tyler, et al., then filed a cross-appeal in No. 86–1044 on January 9, 1986. Black and Wyrick did not brief or argue any issues as appellants in No. 86–1043, but they did brief and argue issues as appellees in No. 86–1044. Therefore, we will dismiss the appeal of Black and Wyrick in No. 86–1043 pursuant to 8th Cir.R. 13 for failure to comply with the Federal Rules of Appellate Procedure. In this opinion we will refer to Tyler, et al., as appellants, and Black and Wyrick as appellees.

*Tyler,* 744 F.2d at 611–12, as having some persuasive effect.

## II. ALLEGED DUE PROCESS VIOLATIONS.

Appellants contend that the first mass transfer of inmates to SMF on July 26, 1982 was done without prior notice or hearings, thereby violating their fourteenth amendment due process rights. They also allege continuing due process violations by appellees in the transfer of inmates to SMF without proper notice or hearings, and in the failure to make timely periodic reviews of the cases of SMF inmates.

In his Report and Recommendation of September 26, 1985, the magistrate essentially adopted his prior September 1, 1983 Report and Recommendation, noting that at the permanent injunctive and declaratory relief hearing no new evidence was presented regarding the July 26, 1982 mass transfer issue and very little new evidence was presented regarding the continuing due process violations issues. The magistrate found that, at the time of the July 26, 1982 mass transfer, appellants did not have a liberty interest in remaining in the general prison population, and that even if they did, they received all of the process they were due. The magistrate also found that appellees' transfer and review policies provide appellants with sufficient process. He therefore recommended that relief be denied on appellants' due process claims.

The district court adopted the magistrate's recommendation with one modification. *Clark v. Brewer,* 776 F.2d 226 (8th Cir.1985), was decided shortly after the magistrate issued his Report and Recommendation. In *Clark* we set out certain standards for review hearings in the cases of inmates in segregation, such as the right of the inmate, in certain situations, to have written notice of the hearing and the evidence to be relied upon, and a limited right of the inmate to call witnesses. *Id.* at

234–36. To the extent appellees' review policy did not comply with *Clark,* the district court granted injunctive relief and ordered compliance. Appellees have evidently modified their review policy to be in line with *Clark.*

Due process claims are generally subjected to a two part analysis: (1) is the asserted interest protected by the due process clause; and (2) if so, what process is due. *Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). It is established that prisoners enjoy the protections of the due process clause and may not be deprived of life, liberty or property without due process of law. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974). It is also well established that prisoners' due process rights are subject to restrictions made necessary by their prison surroundings. *Id.* It is against this basic background that we now consider the administrative and disciplinary segregations involved in this case.

### A. THE JULY 26, 1982 TRANSFERS.

█ Liberty interests protected by the fourteenth amendment have as potential sources the due process clause itself and state laws. *Clark,* 776 F.2d at 230. We have held that in light of *Hewitt v. Helms,* 459 U.S. 460, 467–68, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983), the due process clause itself creates no interest in an inmate to remain in the general prison population. *Clark,* 776 F.2d at 230. Appellants' liberty interests must therefore have state law as their source. Appellants claim that a liberty interest in remaining in the general prison population was created by Mo.Rev.Stat. § 216.455(2) (1978) (repealed 1982)[2] in combination with relevant portions of SMF policy and the Inmate Handbook.

A state created liberty interest arises in situations in which the state has placed

---

2. Section 216.455(2) stated in relevant part:
   Whenever the warden of the penitentiary determines that an inmate is habitually or hopelessly incorrigible, he may transfer the

inmate to a segregation unit which shall be so situated that the segregation of incorrigible offenders from the other inmates of the institution shall be in all respects complete.

substantive limitations on the exercise of official discretion. Liberty interests created by the state may be "found not only in a state's statutes or administrative code, but also in official policy pronouncements that are intended to guide the exercise of discretion."

*Id.* (quoting *Green v. Black,* 755 F.2d 687, 688 (8th Cir.1985)) (citations omitted).

Appellants contend that the combination of statute, policy and handbook in this case exhibited the same state intent to limit the exercise of discretion as did somewhat similar combinations found to create liberty interests in *Hayes v. Lockhart,* 754 F.2d 281, 282–83 (8th Cir.1985), and *Clark,* 776 F.2d at 231–32. Appellees argue that § 216.455(2) was repealed in 1982, the year in which the original mass SMF transfer was made. Further, they contend that even if the statute applied to the mass transfer to SMF, the statute, policy and handbook did not contain the same mandatory type of language (will, shall, must) as did the combinations in *Hayes* and *Clark.*

We are inclined to agree with the magistrate and district court that appellants did not have a liberty interest at the time of the mass transfer. However, the question is close and in light of our analysis of what process was due, we need not base our decision on a holding that appellants had no liberty interest. The mass transfer to SMF on July 26, 1982 was clearly undertaken for administrative purposes. As found by the magistrate and the district court, MSP was in a state of turmoil and the threat of mass violence was substantial. During the week of July 18, 1982, six stabbings had occurred in four days. Warden Wyrick perceived the move as a necessary emergency security measure. No punitive purpose was involved, and those transfers were purely temporary administrative segregations.

In *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871–72, the Supreme Court held that in an administrative segregation situation, the due process clause requires only "an informal, non-adversary review of the information supporting [the] administrative confinement, including whatever statement [the inmate wishes] to submit, within a reasonable time after confining him to administrative segregation." We agree with both the magistrate and the district court that the post-transfer hearings given to the July 26, 1982 transferees more than met the minimum requirements of the due process clause. Therefore, no fourteenth amendment due process rights were violated by the mass transfer.

### B. TRANSFERS AND REVIEW.

■ The written procedures for assignments to SMF and for review of cases of SMF inmates are very specific and are mandatory in nature. We will briefly discuss these procedures separately.

Temporary transfers to SMF can be made by the Warden, Classification Committee, or duty officers for three administrative reasons: (1) the inmate is awaiting hearing or is under investigation for a major rules violation; (2) he is suspected of having committed a criminal act not addressed by the rules; or (3) he poses a threat to himself or others or he constitutes a security threat. For such administrative segregation assignments, due process requires only a post-transfer non-adversary review of the evidence and the opportunity for the inmate to make a statement. *See Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871–72. An inmate temporarily assigned to SMF is given a hearing within seventy-two hours of his transfer. There is also a pre-transfer procedure wherein the inmate is interviewed and is provided with a copy of the detention order. The magistrate and district court found that the procedures for temporary assignments to SMF do not violate the due process clause. We find no error of fact or law in this determination.

■ Permanent assignment to SMF can only be made by the SMF Classification Committee. Some of the permanent assignments appear to be initially punitive rather than administrative, and a more extensive hearing is therefore required. In a disciplinary action situation, due process requires: (1) that written notice of the

charges be provided to the inmate with at least twenty-four hours to prepare for the hearing; (2) that the inmate be provided with a written statement by the factfinders discussing the evidence and reasons supporting the action; and (3) that the inmate be afforded the opportunity, so far as safety and security allow, to call witnesses and present documentary evidence. *Wolff*, 418 U.S. at 563–66, 94 S.Ct. at 2978–80. SMF permanent assignment regulations provide for a hearing that complies with *Wolff*. The magistrate and district court found that the procedures for permanent assignment to SMF do not violate appellants' due process rights, and we agree.

The first review of an assignment to SMF takes place not more than thirty days following the transfer. Subsequent reviews take place at intervals of not more than ninety days. Appellants contend that ninety days is too long between reviews. In *Clark* we stated that "the frequency of ... review must in most cases be left to the informed discretion of prison officials." 776 F.2d at 234. While ninety days is a lengthy time between reviews and, especially in Level I, approaches constitutional limits, we note that Level I inmates are evaluated at least once a week by case workers and inmates on Levels II and III are provided similar evaluations. In light of these evaluation procedures, we are unable to find ninety days constitutionally insufficient.

## C. SUMMARY.

The magistrate found no due process violations in the original mass transfer to SMF, the continuing transfers to SMF, and the review of SMF assignments. He therefore recommended that relief be denied on appellants' due process claims. The district court adopted the magistrate's recommendation with one modification requiring compliance with *Clark* in SMF's periodic assignment review hearings. We find no error in the district court's decision, and we therefore affirm the court's partial grant

and partial denial of relief on appellants' due process claims.

## III. ACCESS TO THE COURTS.

■ Appellants contend that the district court erred in not granting them relief on their claim that appellees have denied them access to the courts. Their denial of access claim results from several complaints regarding the SMF law library and its use by inmates. They first complain that Level I inmates are not allowed physical access to the library and are not allowed sufficient time with the "law clerks." [3] In addition they state that the library is inadequate and that many of the books are missing or are not updated. They further claim that Level II and Level III inmates are not provided with sufficient time in the library and must wait long periods of time to gain access to the library after making requests. Finally, they complain that Level I inmates are not allowed to consult with other inmates who are co-parties in cases, and that SMF inmates who file lawsuits are harassed by corrections officers and officials.

"[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977) (footnote omitted). An adequate law library is only one method for prisons to provide meaningful access, and among the accepted alternatives is "the training of inmates as paralegal assistants to work under lawyers' supervision...." *Id.* at 831, 97 S.Ct. at 1499; *see also Kelsey v. Minnesota*, 622 F.2d 956, 957–58 (8th Cir.1980).

SMF has its own separate law library, and its contents, as found by the magistrate, include a complete set of Southwest Reporters, Volumes 79 through 103 of West's Supreme Court Reporter, 322 through 694 of West's Federal Reporter, 2d

---

3. The "law clerks" are inmates who undergo some form of paralegal training at the prison. They are taught and overseen by Dr. Herb Carter, an attorney and paralegal instructor.

Series, 243 through 551 of West's Federal Supplement, the Missouri Digest, Missouri Revised Statutes, Vernons Annotated Missouri Statutes, Vernons Annotated Missouri Rules, Volumes of the United States Code containing 18 U.S.C., 28 U.S.C. §§ 2241–2254, 42 U.S.C. § 1983, and West's Federal Practice Digest 2d. The evidence showed that missing volumes and updates were on order at the time of the permanent injunction hearing, and that other books were available from the main prison library. The SMF library receives all newly published volumes in each reporter series.

Level I inmates do not have physical access to the library. They must instead file requests to see a law clerk. The inmates communicate with the law clerk through the solid steel cell doors for short periods of time. The clerks can do research for the Level I inmates and may bring them photocopies of cases, statutes or other library materials.[4] At the time of the permanent injunction hearing Level I inmates had access to only one law clerk. This was because the other Level I clerk had been restricted for administrative reasons from going to Level I. However, an increase in the law clerk staff from five to seven had been approved, and although only one clerk had access to Level I at that time, all of the clerks and Dr. Carter were able to assist in research for Level I inmates.

Level II and Level III inmates submit requests to use the library and are issued passes. The library may be used six days a week from 8:30 a.m. to 10:30 a.m. and from 12:30 p.m. to 2:30 p.m. Some testimony indicated that actual use time during these periods is about one hour to one and one-half hours. Five inmates receive passes to use the library during any one period, and special passes may be issued if need exists. The library is staffed by shifts of three law clerks, and the others are usually available for consultation.

The issues raised by appellants regarding SMF's law library and its legal aid

program have been thoroughly reviewed twice by the magistrate. Within the magistrate's extensive discussions are his findings that appellants presented no credible evidence that any inmate had been prejudiced as the result of an inadequate library or of inadequate access to the library or law clerks. In *Williams v. Wyrick*, 747 F.2d 1231, 1232–33 (8th Cir.1984), we affirmed the district court's denial of preliminary injunctive relief on an inmate's claim that he was being denied access to the courts because he was not allowed physical access to the law library. In affirming we noted that Williams, a death row inmate in the Missouri State Penitentiary, had access to law clerks and had never been prejudiced in any of his cases due to the alleged inadequacy of the prison's legal aid system. Lack of prejudice is an equally important factor in the present case.

While it is true that Level I inmates are not allowed to communicate with co-parties in litigation, the magistrate found that no inmate had been prejudiced by this policy and that the evidence clearly indicated a need to keep Level I inmate contacts at a minimum for security purposes. "A prison regulation or practice that burdens an inmate's right of access 'must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials.'" *Id.* at 1232 (quoting *Procunier v. Martinez*, 416 U.S. 396, 420, 94 S.Ct. 1800, 1815, 40 L.Ed.2d 224 (1974)). In light of the lack of any prejudice caused by this policy, the magistrate determined that security considerations outweighed the slight burden on the Level I inmates' rights.

While some inmates did testify to harassment and retaliation for filing lawsuits, this testimony was of marginal credibility. No credible evidence linked the named appellees to any such conduct, and the alleged isolated incidents fall short of establishing a policy or custom. *See Sanders v. St. Louis County*, 724 F.2d 665, 667 (8th Cir.

---

**4.** Level I inmates were previously allowed to have law books in their cells. That policy was

changed due to the mutilation and disappearance of numerous books.

1983). We do not condone these isolated incidents to whatever extent they may have occurred, for "[i]t is settled that an inmate's constitutional right of access to the courts cannot be impaired ... by threatening or harassing an inmate in retaliation for filing lawsuits." *Id.* at 666. However, the evidence does not support a finding of liability against appellees for those incidents. We suggest that appellees take note of these allegations and take steps to prevent any such incidents from occurring in the future.

Upon the recommendation of the magistrate, the district court found SMF's law library and legal aid program to be adequate, and he found that the rights of appellants of access to the courts were not being violated by appellees. The court therefore denied declaratory and permanent injunctive relief on appellants' denial of access claims. We find no clear error or error of law in these determinations, and we therefore affirm the district court's denial of relief on these claims.

## IV. CONDITIONS OF CONFINEMENT.

In their complaint against appellees, appellants challenged numerous conditions of confinement. The magistrate found that SMF inmates are vulnerable to attacks in two situations: (1) when Level I inmates come into contact with unrestrained hall workers; and (2) during mass inmate movements on Levels II and III. The magistrate therefore concluded that appellees had failed to maintain an environment free from the threat and existence of violence. The magistrate found no other violations relating to conditions of confinement. The district court adopted the magistrate's recommendations and issued a permanent injunction requiring appellees to remedy the threat and existence of violence in the two situations set out by the magistrate. Appellees were ordered to submit within thirty days a plan that would increase security personnel and staff to acceptable levels. The court denied relief on appellants' other conditions of confinement claims.

Appellants contend that the district court erred in denying them relief on their eighth amendment claims challenging double celling in Level I, the use of "boxcar" doors in Level I, and the sufficiency of recreation in Levels I, II and III.

The eighth amendment prohibition of cruel and unusual punishment applies to conditions of confinement "when the conditions ... compose the punishment at issue." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *see also Whitley v. Albers,* —— U.S. ——, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

> Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment.... But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399.

> To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishments Clause....

*Whitley,* 106 S.Ct. at 1084.

No simple concise definition of cruel and unusual punishment has been offered by the courts, and perhaps none can be. As put by Justice Douglas in *Robinson v. California,* 370 U.S. 660, 676, 82 S.Ct. 1417, 1425, 8 L.Ed.2d 758 (1962) (Douglas, J., concurring), "The Eighth Amendment expresses the revulsion of civilized man against barbarous acts—the 'cry of horror' against man's inhumanity to his fellow man." Nor are the guidelines for eighth amendment determinations immutable. Their application by civilized people must

take into account broad and idealistic concepts of dignity, humanity and decency. *Campbell v. Cauthron,* 623 F.2d 503, 505 (8th Cir.1980); *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968).

We turn to specific conditions.

## A. DOUBLE CELLING.

■ With respect to the double celling of some inmates on Level I, appellants' greatest concern is the violence and potential for violence in a cell housing two inmates. Cell doors in Level I are solid steel "boxcar" type doors. Appellants contend that guards cannot see into the double cells and therefore cannot monitor the activity between the inmates within. They also contend that inmates cannot easily summon guards if trouble develops. Six inmates testified to being attacked while double celled. Appellants are also concerned that the SMF policy of handcuffing Level I inmates prior to removing them from their cells makes them particularly vulnerable to attacks from cellmates. The policy requires that a Level I inmate who is to be moved from his cell for any reason must put his hands behind his back and place them through the food service port to be handcuffed before being removed. Finally, appellants point out that a prison expert recommended to appellees that they stop double celling due to the potential danger in the practice.

Double celling is not necessarily unconstitutional, but it may be. *Finney v. Hutto,* 410 F.Supp. 251, 257 (E.D.Ark.1976), *aff'd,* 548 F.2d 740 (8th Cir.1977), *aff'd,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

In *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400, the Supreme Court found that double celling in an Ohio prison did not violate the eighth amendment in part because it "did not lead to deprivations of essential food, medical care, or sanitation[,]" and it did not "increase violence among inmates or create other conditions intolerable for prison confinement." The Court further stated that "the Constitution does not mandate comfortable prisons, and prisons ... which house persons convicted of serious crimes, cannot be free of discomfort." *Id.* at 349, 101 S.Ct. at 2400.

There were no findings in this case that the double cells, which measure eighty-eight square feet, are unconstitutionally crowded or unsanitary. Nor were there any findings of unconstitutional deprivations of food or medical care. While there have been some attacks in Level I, none of the inmates were attacked while undergoing the handcuffing procedure for removal from their cells. Although a prison expert was of the opinion that double celling in Level I is not a good idea, and we agree, that opinion does not directly address the constitutionality of double celling.

The evidence shows that inmates who are to be double celled must sign a consent form, and that if an inmate has a legitimate reason for not being housed with another inmate he will not be double celled. Double celling on Level I is therefore done by consent. In fact, many Level I inmates request to be housed with another inmate. We are aware, however, that due to the nature of prison life and the many pressures brought to bear on prisoners by other prisoners and, in some cases, guards and other officials, consent to double cell in fact may not always be voluntary. The magistrate recommended that relief be denied on appellants' double celling claim, and the district court adopted that recommendation. We find no eighth amendment violation in double celling as such on Level I.[5]

## B. BOXCAR DOORS.

■ Appellants also object to the use of solid steel "boxcar" type doors on Level I cells. They complain that the solid construction of these doors makes it impossible for guards to monitor activities within

---

5. While we are mindful of this court's recent decision in *Cody v. Hillard,* 799 F.2d 447 (8th Cir.1986), reheard en banc January 12, 1987, concerning double celling at the South Dakota State Penitentiary, the deficient conditions in the cells there simply are not the same as those found here. Each prison case must be decided on its own facts and total circumstances.

the cells and for inmates to contact a guard if help is needed. Appellants point out that inmates spend twenty-three hours a day in these cells with only one four inch by four foot window looking out over the prison yard. They also note that plans for new replacement doors include more insulation, making communication even more difficult.

The magistrate found that the front of each cell is visible from the control unit and that each cell block is equipped with a very sensitive microphone which allows guards to monitor sounds from the cells. He also found that an emergency lighting system is operational and that air conditioning has been installed to solve ventilation problems.[6] In light of these and other considerations, the magistrate determined that the use of boxcar doors in Level I did not constitute cruel and unusual punishment. He recommended that relief be denied on appellants' boxcar door claim, and the district court adopted that recommendation.

The use of boxcar doors has, in circumstances somewhat different from those in this case, been held to constitute cruel and unusual punishment. *See Bono v. Saxbe,* 450 F.Supp. 934, 946–47 (E.D.Ill.1978), *aff'd in part and remanded in part,* 620 F.2d 609 (7th Cir.1980); *see also French v. Owens,* 538 F.Supp. 910, 927 (S.D.Ind.1982). While we recognize that being confined in an eighty-eight square foot cell with a solid door for twenty-three hours a day is anything but pleasant, we cannot say that the use of boxcar doors by itself involves "the wanton and unnecessary infliction of pain," *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399, necessary to constitute cruel and unusual punishment.

## C. RECREATION.

█ Appellants contend that recreation opportunities in SMF are insufficient and constitute cruel and unusual punishment.

Level I inmates are allowed recreation every other day for about forty-five minutes in the small outdoor Level I recreation yards. On alternate days they are allowed ten to fifteen minute showers. At the time of the permanent injunction hearing, Level II and Level III inmates were allowed recreation twice a week, either indoors or outdoors, for two and one-half hours per period. They also attended movies once a week and were allowed daily showers. Appellees state that recreation is now allowed daily on Levels II and III.

The magistrate found that in the totality of the circumstances, recreation was not so insufficient as to violate the eighth amendment. He therefore recommended that relief be denied on appellants' recreation claim, and the district court adopted his recommendation.

Appellants rely on *Campbell,* 623 F.2d at 507, for the proposition that a prisoner who is confined to his cell for more than sixteen hours a day should be allowed recreation for one hour a day. The circumstances in this case, however, are very different from those in *Campbell.* When visitation time on all three Levels, opportunities for jobs and religious activities on Levels II and III, and other favorable SMF conditions are considered, we cannot say that recreation opportunities in SMF, viewed alone, are so deficient as to constitute cruel and unusual punishment.

## D. TOTALITY OF THE CIRCUMSTANCES.

█ In his concurring opinion in *Rhodes,* Justice Brennan suggested that "a court considering an Eighth Amendment challenge to *conditions of confinement* must examine the totality of the circumstances." 452 U.S. at 362–63, 101 S.Ct. at 2407 (Brennan, J., concurring in judgment) (footnote omitted). Similarly, this court has noted

**6.** While we recognize that good faith efforts have been made to improve the ability of guards to monitor activities within the Level I cells, problems still exist. Guards are not able to see inside the cells from their stations, and it is not clear that lights located near the outside of each door could be turned on from the inside or whether such lights were fully operational. In addition, in light of the heavy insulation in the doors and the assumption that the guards do not listen to every cell block all of the time, an inmate may or may not be able to summon help by yelling.

the "totality of circumstances" standard. *See, e.g., Villanueva v. George,* 659 F.2d 851, 854 (8th Cir.1981) (en banc); *see also supra* note 5.

Although we were unwilling to find that the use of boxcar doors in SMF, by itself, constituted cruel and unusual punishment, the use of boxcar doors in the totality of the circumstances of confinement at SMF creates a much more difficult question. We find that in the totality of the circumstances, the use of boxcar doors on either single or double cells on Level I constitutes cruel and unusual punishment and violates the eighth amendment.

The words of the district court in *Bono* are applicable here.

> The most odious characteristic [in the control unit] ... was the closed-front cell, the boxcar. An inmate would spend nearly every minute of every day in his cell, cut off from any contact with the outside world—even the limited "outside world" of the incarcerated felon. The inmates' existence was limited by the space of his cell and the approximately three feet beyond the cell bars, at which point the outer wall was erected. These walls contained but a small window in the door. Even though the inmate could express a preference as to whether the outer door would be open or closed, the correctional officer had the final say in the matter.

> The sensory deprivations occasioned by use of the boxcars ... resulted in both mental and physical deterioration. Simultaneously, unnecessary pain and suffering was the result.

450 F.Supp. at 946–47 (footnote omitted).

While the cells in SMF are larger than the cells in *Bono* (eighty-eight square feet compared to fifty-two square feet, respectively), in SMF it appears that the boxcar doors are the only doors on Level I cells, and they must therefore be left closed at all times. Due to limited recreation on Level I, inmates spend at least twenty-three hours a day in these closed cells, and since case reviews can take place at up to ninety-day intervals, inmates can spend several months in Level I cells. "[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." *Hutto v. Finney,* 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978). In *Hutto* the Supreme Court upheld the decision of the district court that a prisoner in the Arkansas penal system could not be confined in punitive isolation for more than thirty days at a time. *Id.* at 688, 98 S.Ct. at 2572. We are not suggesting that confinement on Level I of SMF constitutes punitive isolation in its worst form and we are certainly not suggesting that conditions on Level I approach those discussed in *Hutto.* There are, however, limits to what a prisoner must endure, and being confined in a closed front cell in the circumstances present on Level I for what could potentially be several months constitutes cruel and unusual punishment.

When double celling on Level I is added to the mixture, a highly volatile situation is created. SMF was designed as a behavior modifier for inmates who have exhibited aggressive, assaultive and predatory behavior toward staff and other inmates of the penal system. Most of the inmates kept in SMF are there because of some serious violation. The rate of assaults among SMF prisoners is extremely high as compared to the rate among prisoners in general population. Absent adequate monitoring it defies reason to place two of these inmates in an eighty-eight square foot cubicle with a solid boxcar door and only one narrow outside window for twenty-three hours a day.

As we have discussed, an inmate's consent to have a cellmate may or may not be voluntary, and the monitoring of activities within the cells is difficult in spite of good faith efforts. As noted, a guard on duty in the control center may listen in on any group in his unit but he cannot, and doubtless does not, make any successful effort to monitor all cells at all times.

The combination of these conditions creates an environment which is very dangerous for Level I inmates and indeed invites

and encourages violence and threats of violence. In addition, although evidence in the record is sparse, we suspect that this combination of conditions has a devastating effect on the mental health of inmates so confined. Moreover, double celling under present conditions may contribute to spread of infectious disease and promote undesirable homosexual activity.

We again observe that appellees' expert witness thinks double celling at Level I is not a good practice. MSP officials agree. Witness Armontrout testified that he felt the prison should go to single celling but that he could see no immediate relief other than a new maximum security institution. But the state has a duty to safely keep its prisoners, *Finney v. Arkansas Board of Correction*, 505 F.2d 194, 201 (8th Cir. 1974), and we cannot permit unconstitutional conditions to exist simply because prison officials cannot or will not spend the money necessary to fulfill constitutional requirements. *Campbell*, 623 F.2d at 508. After all, "[p]ersons are sent to prison as punishment, not *for* punishment." *Battle v. Anderson*, 564 F.2d 388, 395 (10th Cir. 1977).

We therefore find that in the totality of the circumstances, appellees' use of boxcar doors on Level I of SMF violates the eighth amendment. We remand to the district court for determination of a remedy, and, in light of their good faith efforts throughout this case, we suggest that appellees be allowed to propose a plan that they feel will be best for correcting this violation. One possible solution would be the installation of standard cell bars inside of the boxcar doors. The boxcar doors could then be closed only when necessary.[7] While we do not hold that double celling on Level I is unconstitutional absent the boxcar doors, a possible partial solution would be to go to single celling immediately. There may be other appealing and practical solutions as well. The court is of course free to hold hearings, take evidence, or otherwise proceed consistently with this opinion. Our finding of an eighth amendment violation applies to Level I inmates who are double celled, and to those who are celled singly.

## V. CONCLUSION.

The appeal of Black and Wyrick, No. 86–1043, is dismissed pursuant to 8th Cir. R. 13. In a pro se brief, appellant Tyler raises many other issues, none of which merits discussion here. We have considered all of the issues raised in this case, and we have discussed those arguably having merit. We hold that in the totality of the circumstances, the use of boxcar doors on Level I of SMF constitutes cruel and unusual punishment in violation of the eighth amendment. We therefore reverse that part of the decision of the district court and we remand with instructions. Finding no other error of fact or law, the remainder of the court's judgment in all respects is affirmed.

---

7. As discussed, the cells in *Bono* were equipped with standard bars inside of the boxcar doors. It was therefore possible to leave the boxcar doors open on those cells. The district court enjoined the continued, nonconsensual closure of the boxcar doors, *Bono*, 450 F.Supp. at 947, and, in a later round of the same case, held that a constitutional plan governing the closure of the boxcar doors would be one in which:

(a) the discretion of the [facility manager] to close an outer door is limited by a written rule providing under what circumstances it will be closed; (b) [the inmate is informed of] the reason for the closing of the outer door and under what conditions it shall be reopened; and (c) [there is] some form of review to assure the discretion of the [facility manager] is being properly exercised.

*Bono v. Saxbe*, 527 F.Supp. 1187, 1192 (S.D.Ill. 1981). Should appellees choose to remedy the violation we have found by installing standard bars inside of the boxcar doors, we feel that they should follow this basic framework in establishing a policy for the closure of the outer doors. This will protect inmates on Level I from further constitutional violations in the form of arbitrary or undue lengthy closure of the boxcar doors.