1358

William MADDEN, et al., Plaintiffs,

v.

Mike KEMNA, et al., Defendants.

Randall Lee SMITH, et al., Plaintiffs,

v.

Mike KEMNA, et al., Defendants.

Nos. 89–6092–CV–SJ–6,
89–6099–CV–SJ–6.

United States District Court,
W.D. Missouri, W.D.

May 11, 1990.

Steven G. Emerson, Morris & Larson, P.C., Kansas City, Mo., for plaintiffs.

Thomas A. Sheehan and Claudia J. York, Shughart, Thomson & Kilroy, P.C., Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

SACHS, District Judge.

These consolidated cases were brought by some twenty-five prisoners from Colorado who have been transferred to Western Missouri Correctional Center (Cameron) from their home state, pursuant to a contract for imprisonment here. Plaintiffs are before the court on motions for a preliminary injunction. They contend they have been deprived of liberty interests without due process of law in that they are being held in a protective custody segregation unit as requested by them, but without being afforded the same general privileges provided inmates in the general prison population as generally mandated by Missouri prison regulations. It is contended that prison authorities have neither asserted nor shown any security needs for such inequality of privileges or any lack of available resources which would provide a regulatory justification for the conduct of such officials.

Defendants are Mike Kemna, superintendent of the Cameron facility, and the Missouri Department of Corrections and Human Resources, which is charged with the responsibility for the administration of all correctional institutions within the state.[1] Defendants' brief, filed May 9, 1990, contains some useful factual and procedural statements and arguments, and quotations used in this memorandum without attribution are taken from that brief.

"These cases were originally filed by plaintiffs pro se. However, the court appointed counsel for plaintiffs in December of 1989. The first matter taken up by plaintiffs' counsel after his appointment concerned plaintiffs' request for preliminary injunctive relief. At that time, the court requested that plaintiffs' counsel inform the court whether there was a necessity to have a hearing on plaintiffs' initial request for emergency injunctive relief. Following discussions between counsel, defendants' counsel informed plaintiffs' counsel that the present available resources and ability to address plaintiffs' security concerns allowed defendants to provide some additional privileges defendants were previously unable to provide. Specifically, defendants determined that protective custody inmates were numerous enough to be placed in a unit of their own with open movement (Housing Unit 2), and protective custody inmates could be escorted to the gym, the law library and food service. However, defendants were unable to provide organized religious services or more than two hours per week of phone access. Following these discussions, plaintiffs' counsel informed defendants' counsel and the court that a hearing on plaintiffs' request for emergency relief was not necessary.

"Thereafter, although plaintiffs' counsel indicated a desire to further discuss a final resolution of this case, except for one or two requests to check into a specific complaint by an individual plaintiff, no further discussions were initiated by plaintiffs' counsel until April 26, 1990, when defendants' counsel met with plaintiffs' counsel to review plaintiffs' [new] complaints.

"While these discussions were occurring, [allegedly] because of a change in resources available at Western Missouri Correctional Center, and because of the security needs of the plaintiffs, they were transferred to Housing Unit 1 which houses disciplinary segregation inmates and inmates being received into the prison prior to their classification in general population. This transfer, which was occasioned by the transfer of Missouri protective custody inmates to another institution at Farmington and the receipt of additional Missouri general population inmates was [allegedly] necessary because of the need for space in Housing Unit 2 and the continuing protective custody needs asserted by the plaintiffs.

"Plaintiffs argue that they have certain fundamental rights in certain privileges guaranteed by the Constitution and that they should receive the same privileges and/or treatment as general population inmates. Further, they argue that the Department regulations, in specific and mandatory language, require more privileges than they receive, and that these regulations afford plaintiffs a liberty interest protected by the Fourteenth Amendment which requires that defendants provide them the same privileges as they have received in the past or have been provided to general population inmates.

---

1. Whether the Department is subject to a damage suit under the Eleventh Amendment is a subject of a pending motion to dismiss, but is not in serious question insofar as injunctive relief is sought against the officials of that Department. *Ford v. Lane,* 714 F.Supp. 310 (N.D. Ill.1989). It may be better practice to describe the officials by title (Rule 25(d)(2), Fed.R.Civ. P.), but at this stage in litigation it may be unknown who within the Department caused certain transfers of other protective custody prisoners to Farmington, with knowledge of the probable effect on these plaintiffs. Mr. Kemna doubtless had such knowledge, and there is no evidence that he protested to his superiors at the Department *or otherwise attempted to assure* that plaintiffs would not be denied the equality of conditions generally mandated by Missouri prison regulations hereinafter discussed. As a matter of careful practice injunctive relief will be directed toward Kemna and the director of the Department of Corrections.

"Defendants have argued ... that plaintiffs have neither a constitutional right nor a liberty interest in the privileges they seek to have mandated by this court. This is because they have no constitutional right to such privileges and, even if a liberty interest has been created by the regulations of the Department of Corrections, plaintiffs have failed to prove that the defendants have failed to follow their own regulations to the extent that the plaintiffs have been denied due process."

When the lawsuit was filed, plaintiffs were in Housing Unit 1, sometimes referred to as "the hole," and were locked down virtually all of each twenty-four hour day, including meal times and times when general population prisoners were free to use library facilities, recreational facilities, and to engage in normal social interaction. Plaintiffs were thereafter moved to a protective custody wing of Housing Unit 2, and while some ongoing complaints may have been unresolved, the totality of circumstances did not call for prompt judicial intervention, and none was sought. Plaintiffs were returned to Unit 1 on April 25, 1990, and counsel sought emergency relief on April 27, 1990. After consolidation of the cases a preliminary injunction hearing was scheduled and conducted on May 3, 1990. Further filings have been permitted, received and considered.

Plaintiff Smith, a representative plaintiff, testified at the hearing. Among other things he testified to conditions in Colorado that caused him to seek protective custody, and testified that one or more dangerous enemies of his is in the general population at Cameron. His complaints about conditions at Unit 1 are many. The cell in which he is housed is essentially stripped of furnishings other than a bunk and mattress and toilet facilities and a sink. There are no electrical outlets permitting use of television sets, which severely restricts communication from the outside world. Telephone facilities are restricted. Smith has pro se litigation in progress in Colorado but is unable to visit the law library or to obtain legal material other than by restricted, highly limited contacts with a visiting paralegal assistant. Recreational use of a gymnasium has been terminated. Smith believes the loss of educational, rehabilitative or vocational training time will prevent accrual of time counted in determining his parole date. Food is provided on trays slipped through the door to the cell. The method of supplying food carried by members of the general prison population allows intentional contamination by enemies, including spitting into the trays. Smith complains that a recommended operation for a possible or potential cancerous rectal condition has been denied. Showers are allowed from 1:00 a.m. to 4:00 a.m., apparently not the hours allocated to protective custody prisoners prior to the retransfer to Unit 1. One or more guards has reportedly used threatening language. Communion has been unavailable.[2]

Superintendent Kemna, called as an adverse witness, testified that the current lockdown is complete on two days during the week, and lasts for approximately 23 hours daily during the remaining five days. Unit 1 is used for the most severe disciplinary punishment at Cameron. Plaintiffs are restricted in the same manner as disciplinary prisoners, except that visitors are allowed plaintiffs (who generally have no visitors from this area). Plaintiffs were retransferred to Unit 1 when some 40 protective custody prisoners from Missouri were transferred to the Farmington facility. The wing in Unit 2 formerly occupied by plaintiffs was then released for use by the general population, consisting of some 1900 prisoners. Additional prisoners were sent to the Cameron facility to occupy the wing formerly used by plaintiffs.

Prisoners in Unit 1 cannot visit the canteen but can order from lists, although there are complaints that orders have not been taken or filled. Telephoning is limited to ten minutes during the one to two hour period of recreation daily which is apparently the only scheduled time during the week when the Unit 1 prisoners are re-

2. Testimony from Chaplain Jones tends to establish that arrangements have now been completed for individual communion, beginning the first weekend in May.

leased from their cells. They do not go to the main gymnasium. General population prisoners may attend various classes, including vocational training, and may attend religious services and meetings of approved groups such as Alcoholics Anonymous. Sick call does not include a time for the Unit 1 prisoners, but they are to be visited at their cells by doctors when a justifiable request is made.

Mark Jacob, unit manager of Unit 1, testified that he anticipates that plaintiffs will be returned to Colorado before the end of July. Kemna testified, presumably with greater knowledge, that the first week of July would be the period when plaintiffs would be released for retransfer. Jacob testified that showering in the middle of the night is convenient to the prisoners, who are awake at that time and sleep until late morning.[3] No legal books are available for study in the cells; at best it appears that limited pages of photocopied material are supplied. This implies that normal reading material such as books would also be unavailable in the cells, thus aggravating the absence of television and all other outside communication. Except for restricted yard exercise, the situation may be characterized as essentially "solitary confinement." Jacob denied a claim that he had threatened to tear-gas the plaintiffs and further denied that he had made threats in jest. For present purposes the denial will be accepted, although a number of affidavits dispute Jacob.

The court inquired at the hearing whether the Department had some articulable need to transfer protective custody inmates to Farmington in a manner that would cause closing of the Unit 2 wing to the Colorado inmates. No explanation has been tendered. Subsequent to my leaving the hearing Kemna simply said for the record that "our original effort was ... to rid ourselves of the protective custody unit." Neither a security problem nor shortage of resources (except as self-inflicted) has been cited for the damaging conduct. Superintendent Kemna did testify that Unit 1 facilities had been approved by the deputy director for operations of the Colorado penal system, George E. Sullivan. While the facility may have been approved for disciplinary purposes or for brief temporary use, it is very difficult to believe that Sullivan gave approval of the use of Unit 1 for protective custody prisoners expected to remain there for many months or for approximately one year, under the conditions described by all the witnesses.[4] In any event, plaintiffs do not rest their claim on any violation of the contract or other agreement with Colorado authorities.

## II.

Turning to a legal analysis of the issues, the pleadings assert (1) denial of reasonable opportunities to exercise religious freedoms, (2) denial of access to essential legal materials and legal assistance, (3) denial of access to adequate medical and dental care, (4) denial of access to needed mental health care, (5) denial of adequate vocational, educational and rehabilitation programs, (6) denial of access to adequate telephone facilities, (7) denial of access to adequate grievance procedures, and (8) subjection to harassment and retaliation because of the present court action. Plain-

---

3. The credibility of this testimony may be questioned. While some of the prisoners may of course be "night owls," it seems extremely unlikely that a majority of the Unit 1 prisoners remain wakeful during solitary conditions existing in their cells at 1:00–4:00 a.m. Affidavits show that individual plaintiffs are awakened for showers.

4. The Sullivan letter of October 13, 1989, labels as "FALSE" the claim that protective custody prisoners are subject to what approximates a "24–hour lockdown," and asserts that "the protective custody unit has a rather large and common area space which is available to assigned inmates *upon request.*" (Emphasis added.) He made an observation that five such prisoners "were in the common area space talking and lounging upon our arrival in the unit," and noted library books and presumably operational television sets in the cells. At the hearing Superintendent Kemna rejected the feasibility of allowing protective custody prisoners out of their cells "upon request," thus acknowledging drastically different conditions from what Sullivan observed. The Sullivan visit may have occurred during the limited recreation period, but the misunderstanding of a critical issue is indeed strange.

**1362**

tiffs also assert that defendants' conduct "enumerated above and the general disparate treatment of protective custody inmates violates plaintiffs' liberty interests protected by the Fourteenth Amendment in that defendants' conduct violates MDCR 20–1612.020.7, which provides in part that 'inmates housed in protective custody segregation units shall be afforded the same general privileges provided inmates in general population, as is consistent with existing available resources and the security needs of the institution.' " [5]

Defendants specifically respond to the exercise of religion, access to the courts, security and protection and medical and dental care issues. More generally, they assert that "the due process clause itself creates no interest in an inmate to remain in the general prison population," citing *Tyler v. Black*, 811 F.2d 424, 427 (8th Cir. 1987), which in turn relies on *Hewitt v. Helms*, 459 U.S. 460, 467–8, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983). They further contend that the cited regulation is insufficiently "specific" in its "substantive predicates" to limit the fullest exercise of discretion by prison authorities. *Kentucky Department of Corrections v. Thompson*, — U.S. ——, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989). Finally, they assert that resources to accommodate plaintiffs in their right to substantially equal privileges disappeared, once the transfer of some 40 out of a group of some 65 protective custody prisoners occurred.

■ On preliminary injunction analysis, I must determine whether plaintiffs are likely to prevail on the merits, when the case has been fully prepared and submitted. *Nordin v. Nutri/System, Inc.*, 897 F.2d 339, 354 (8th Cir.1990). Taking the common problems of the plaintiffs, it seems less than likely that any naked rule of constitutional law has been violated. There is, however, a material chance that severely disparate treatment of protective custody prisoners would suffice. *Williams v. Lane*, 851 F.2d 867 (7th Cir.1988). Compare, *Tyler v. Black*, 811 F.2d 424, 433–5 (8th Cir.1987) (23–hour daily confinement of prisoners in a closed-front cell, where the court held that the extreme isolation imposed may have had "a devastating effect on the mental health of inmates so confined").[6] It is somewhat difficult to understand why a severe disparity should be permitted, merely for convenience, or even as an economy measure, any more than such severe disparity would be permitted, for example, as between a men's institution and a women's institution.

■ I do find a severe disparity on the material presented to me. It would be overly generous to defendants to conclude that the protective custody prisoners enjoy two-thirds of the privileges available to the general prison population; a 50% ratio in the quality of living conditions seems more likely, judging the totality of conditions, as *Tyler v. Black* teaches is appropriate.

Plaintiffs have clearly presented a prima facie violation of the mandatory regulation, generally requiring substantial equality of privileges. Missouri Department of Corrections Reg. 20–1612.020(7). P.Exh. 2, quoted above. Plaintiffs certainly do not enjoy "the same general privileges provided inmates in general population," and even if it be assumed they have the further obligation to show that the restrictions do not naturally flow from some restriction on "existing available resources" or from "the security needs of the institution," there is no present reason to believe that either security or lack of resources lies at the root of the deprivation. Defendants have elected, without explanation, to reshuffle the prison population so as to phase out the protective custody unit at Cameron; by defendants' volition the difficult situation for plaintiffs has been created. This plainly violates, in my judgment, the major lesson of the rule, which is designed to prevent any unnecessary and substantial dis-

---

**5.** Other constitutional violations are asserted but need not be evaluated in that the strongest contention here stated is deemed sufficient.

**6.** This portion of the opinion has been withdrawn, where radio reception in the cells is available. *Tyler v. Black*, 865 F.2d 181, 184 (8th Cir. en banc 1989).

parate treatment.[7] If there is some sound explanation that would allow defendants to assert lack of resources, for example, as an excuse, that may be developed before the damage suit is heard on the merits. On the present record, plaintiffs are very likely to prevail, and to satisfy the other requirements for relief pending litigation.

The regulation relied on is sufficiently mandatory and sufficiently definite to create a protected liberty interest under the Constitution, as presently construed. *Taylor v. Armontrout*, 894 F.2d 961 (8th Cir. 1989).[8] There is explicitly mandatory language and adequate guidelines serving to limit official discretion. Examples can be found where somewhat vague language that is less capable of objective determination than that here used has been considered sufficient to show that unrestricted discretion has been abolished by the State itself. *Compare, Clark v. Brewer*, 776 F.2d 226, 230-2 (8th Cir.1985). The prison officials thus appear to have deprived plaintiffs of a liberty interest without due process of law. I am convinced on the present record that they have seriously misapplied the regulation at bar, in relying on an artificial contrivance rather than an unfortunate situation which they were unable to prevent or handle equitably. In any event they have made no effort to equalize the impact of any hardship and have forced the entire deprivation on 25 individuals rather than on all the 2000 prisoners housed at Cameron.

### III.

■ The matter of relief is the most baffling part of this case in its present posture. It seems clear that plaintiffs should not be held in "solitary confinement" any longer than necessary, and the best solution would doubtless be their return to Colorado in a matter of a few days. Plaintiffs' counsel has suggested another form of quick relief, by transferring the disciplinary prisoners from Unit 1 to another institution, thus allowing Unit 1 to become a protective custody facility with conditions roughly comparable to those existing in Unit 2 before the April 25 transfers. Perhaps the Colorado authorities would authorize the transfer of plaintiffs to Farmington, and Farmington could accept them without overcrowding. Simply opening the doors of the cells, as was allegedly done for the visit of Mr. Sullivan, might go a long way toward meeting the major problem, as perceived by the court, but it is recognized that Mr. Kemna rejected this as lacking in feasibility in May, although Sullivan understood it was the standard operating procedure in October.

The court will not try to present defendants with a list of items they should resolve in a particularized manner. Apart from avoiding unnecessary intrusiveness, I believe the record is too sketchy to permit evaluation of the claims of each plaintiff, and the court has reached its conclusion based on totality-analysis.

It is concluded that the court should simply order defendants to comply with their own regulation, taking into account Department-wide resources. This should be sufficiently definite in phrasing to permit understanding compliance, particularly with the gloss added by this opinion. It should also prevent a voluntary shifting of resources between facilities to serve as an excuse for imposing inequitable hardships.

It is therefore ORDERED that, pending litigation, defendants Kemna and the director of the Department of Corrections shall promptly, and within no more than

---

**7.** Even if resource limitations mandated a reduction of privileges, no effort to equitably distribute the loss has occurred. If protective custody inmates are confined to Unit 1 for ten days, the general population inmates might be chosen in some manner for similar deprivation for similar short periods. If this seems bizarre, some ingenuity by prison officials seriously committed to equalizing conditions could doubtless alleviate the disparity problem in another manner.

**8.** The Eighth Circuit rule seems more favorable to prisoners than I concluded in *Williams v. McClain*, 708 F.Supp. 1086, 1088 n. 1 (W.D.Mo. 1989). I was there enunciating what the Supreme Court calls a "bright line" test, not yet adopted according to *Kentucky Department of Corrections*, 109 S.Ct. at 1909 n. 3.

ten (10) days (unless the time is extended by the court for some compelling reason) comply with the Missouri prison regulation mandating that the Colorado inmates presently housed in protective custody segregation at Cameron, Missouri, be afforded the same general privileges provided inmates in the general prison population, consistently with existing available resources of the Department of Corrections and the security needs of the Department. It is further

ORDERED that, no measurable monetary harm to defendants being shown,[9] and no material availability of plaintiffs' funds being established, no bond shall be required as a condition of preliminary injunctive relief in this case.

---

9. On the contrary, each day's delay in providing relief adds to defendants' exposure to damages and attorneys' fees.