908 F.2d 310
 Eugene K. SANDERS[1] and Bill Herron, Appellants,
v.
MacArthur WOODRUFF, Bill Armontrout, Donald Cline, Henry
Jackson, Dale Riley, Dick Moore, George Lombardi,
Bobby Whiteside, William Webster, John
Ashcroft, Cavanaugh and A.
Dearixon, Appellees.
 No. 87-2127.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 15, 1990.
Decided July 10, 1990.
Rehearing and Rehearing En Banc Denied Aug. 21, 1990.
 
 Claudia York, Kansas City, Mo., for appellants.
 Kelly Mescher, Jefferson City, Mo., for appellees.
 Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and HEANEY, Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Bill Herron appeals from a district court[2] order dismissing his claim, filed under 42 U.S.C. Sec. 1983 (1982), in which he argued that his reassignment from Level II to Level I of the Special Management Facility (SMF) of the Missouri State Penitentiary (MSP) violated his due process rights. Herron argues that the district court erred in adopting the Report and Recommendation of a United States Magistrate,[3] which recommended that his claim be dismissed on grounds that the relevant Missouri statute, Mo.Rev.Stat. Sec. 217.375 (1986),[4] and relevant penal regulations 20-212.060 (now 20-212.040) and 20-112.040, did not create a liberty interest in Herron's transfer within the SMF. We affirm the district court's order.
 
 
 2
 The SMF served as the behavior modification and administrative segregation unit of the MSP. The SMF consisted of three housing units in two buildings: Housing Unit 5C housed Level I inmates, Housing Unit 5A housed Level II inmates, and Housing Unit 5B housed Level III inmates. Levels I through III were progressively less restrictive.
 
 
 3
 In December 1985, Herron escaped from the custody while being transported to the Boone County Circuit Court. After Herron was recaptured, he was returned to MSP and was placed temporarily in Level I of the SMF. Herron was charged with a conduct violation and appeared before the adjustment board. At his adjustment board hearing, Herron was given a copy of the written charges against him and was asked if he wished to call any witnesses or make a statement. The adjustment board found Herron guilty of a conduct violation, gave him ten days of punitive segregation, and referred him to the SMF classification committee. Soon thereafter, Herron met with the classification committee and was assigned to Level I of the SMF.
 
 
 4
 The classification committee reviewed Herron's status, as per Mo.Rev.Stat. Sec. 217.375, on January 29 and April 7, 1986. After each review, the committee recommended that Herron remain "as is." At his next review, July 9, 1986, the committee recommended that Herron be transferred to Level II, but this recommendation was overruled by Deputy Warden Donald Cline, based on his conclusion that Herron was "an extraordinary escape risk." (Tr. 23-24). Nevertheless, on October 17, 1986, after a later recommendation by the committee was approved, Herron was moved to Level II. On October 30, 1986, the committee recommended that Herron be transferred to Level III. In early December 1986, Dale Riley, Assistant Director of the Division of Adult Institutions, toured the SMF and noticed that Herron was in Level II. Riley went to the Warden of the MSP, Bill Armontrout, and recommended that, based on the number of Herron's escapes and attempted escapes, Herron be moved back to Level I. Armontrout agreed with Riley and issued a detention order on December 8, 1986, which ordered Herron moved back to Level I. On December 10, 1986, the classification committee reviewed Herron's placement and formally reassigned him to Level I.
 
 
 5
 Herron then filed suit under 42 U.S.C. Sec. 1983. Herron's original complaint was based on issues not currently before us. However, during the pendency of this litigation, Herron filed an amended complaint alleging that he had a liberty interest in remaining in Level II and that his reassignment to Level I violated his right to due process. The magistrate conducted an evidentiary hearing on Herron's requests for preliminary and injunctive relief and issued a Report and Recommendation on April 1, 1987, and another on April 30, 1987, dismissing Herron's complaints. On July 28, 1987, these Reports and Recommendations were adopted by the district court in all respects. Herron appealed the district court's order, and we appointed counsel for Herron and requested that Herron's counsel and the appellees submit briefs on the due process issue. The appellees then filed a motion for remand, which we granted. Following this remand, the magistrate conducted an evidentiary hearing on the due process issue and concluded in his Report and Recommendation that Herron's suit should be dismissed because he had failed to establish that he had a protectible liberty interest in remaining in Level II. The magistrate specifically found that the detention order was not based on any new violation or any problem with conduct, but was for administrative rather than punitive reasons. The magistrate stated that Level I was the more modern design where visual observation was available and was accordingly more secure than Level II. The magistrate concluded that Level I was the most secure area of the penitentiary, that Herron was one of the most accomplished escape artists in the MSP, and that no liberty interest was infringed upon by Herron's reassignment to Level I.
 
 
 6
 The district court, after a de novo review of the record, accepted the magistrate's recommendations and dismissed Herron's suit. We heard oral argument on this issue on October 11, 1989, and then, following a pro se motion by Herron for additional injunctive relief, heard oral argument again on March 15, 1990.
 
 I.
 
 7
 Herron argues that the district court erred in concluding that he had no liberty interest in remaining in Level II of the SMF.
 
 
 8
 "Due process claims are generally subjected to a two part analysis: (1) is the asserted interest protected by the due process clause; and (2) if so, what process is due." Tyler v. Black, 811 F.2d 424, 427 (8th Cir.1987), adopted in relevant part, 865 F.2d 181 (8th Cir.) (en banc), cert. denied, --- U.S. ----, 109 S.Ct. 1760, 104 L.Ed.2d 196 (1989). To prevail, Herron "must first identify some 'liberty interest,' created by state law, regulation, or practice, to which he has a legitimate claim of entitlement, before addressing the question of what process is due." Nash v. Black, 781 F.2d 665, 668 (8th Cir.1986). As we noted in Nash:
 
 
 9
 [T]here are two standards under which we determine whether a protected liberty interest is created: 1) does a statute, regulation, or official policy pronouncement contain particularized substantive standards or criteria that significantly guide decisionmakers; and 2) does the statute, regulation, or official policy pronouncement use mandatory language requiring the decisionmakers to act in a certain way.
 
 
 10
 Id.
 
 
 11
 Although we review issues of law de novo, Sherpell v. Humnoke School Dist. No. 5, 874 F.2d 536, 539 (8th Cir.1989), "we are bound by the factual findings of the magistrate and district court unless they are clearly erroneous," Tyler, 811 F.2d at 426.
 
 
 12
 Herron argues that his liberty interest was created by the language of Missouri Revised Statute section 217.375, and prison regulations 20-212.060 and 20-112.040, citing Knight v. Armontrout, 878 F.2d 1093, 1095 (8th Cir.1989) and Howard v. Armontrout, 729 S.W.2d 547, 549 (Mo.Ct.App.1987) (per curiam) to support his position.
 
 
 13
 Statute section 217.375 deals primarily with the placement of inmates in administrative segregation units. In Howard, the Missouri Court of Appeals, Western District, held that a liberty interest was created by statute section 217.375; however, that case involved the transfer of an inmate to the SMF, not the reassignment of an inmate already in the facility, see 729 S.W.2d at 548, and, therefore, is not applicable to the case before us today.
 
 
 14
 Regulation 20-212.060 established the rules that governed inmates in the SMF. In Knight, we held that regulation 20-212.040(7)[5] created a protectible liberty interest for inmates being temporarily placed in administrative segregation from the general population. 878 F.2d at 1095. As previously discussed, however, Herron was in administrative segregation, not the general population, when he was transferred back to Level I, and therefore the liberty interest identified in Knight is not applicable.
 
 
 15
 Regulation 20-112.040 establishes rules governing the placement of inmates in administrative segregation. When Herron was transferred back to Level I, he was given a full hearing by the classification committee within seventy-two hours of his reassignment, and the committee concluded that he should be reassigned to Level I. Furthermore, in accord with this regulation, Herron's classification is reviewed every ninety days by the classification committee and at that time he is given the opportunity to submit comments in writing, be represented by counsel substitutes, call witnesses (with permission of the committee), and present documentary evidence. Herron has been afforded all the review to which an inmate in his situation is entitled under 20-112.040, and we do not believe that he is entitled to any further rights under it.
 
 
 16
 Moreover, we are satisfied that the district court's findings of fact were not clearly erroneous.
 
 
 17
 Herron argues that the district court's finding that all three levels of the SMF served as administrative segregation is clearly erroneous. He cites a district court order in another case to support this contention. In Tyler v. Black, No. 82-4162-CV-C-5, slip op. at 3 (Oct. 14, 1983) (order granting in part and denying in part plaintiffs' motion for preliminary injunctive relief), affirmed, 744 F.2d 610 (8th Cir.1984), the district court stated that "it was clearly established that only Level I of the [SMF] was used by the defendants to administratively segregate inmates." To support this conclusion, the court cited testimony from Donald Wyrick, who was warden of the MSP at that time. We believe that the district court's conclusion in the instant case is supported by evidence in the record. Testimony at Herron's evidentiary hearing on the due process issue by the current warden of the MSP, Bill Armontrout, established that the entire SMF was used as administrative segregation. (Tr. 90-92). Moreover, support for this proposition can be found in other cases we have decided concerning inmates in the SMF of the MSP. See Williams v. Armontrout, 852 F.2d 377, 378 (8th Cir.) (observing that the SMF was "a behavior modification unit which is also considered to be administrative segregation"), cert. denied, 488 U.S. 996, 109 S.Ct. 564, 102 L.Ed.2d 589 (1988); Tyler, 811 F.2d at 426 (noting that "SMF's purpose is to serve as housing for administrative and disciplinary segregation of inmates from the general prison population"). The district court's finding on this point is not clearly erroneous.
 
 
 18
 Herron also argues that Riley erroneously testified that he saw Herron outside his cell in Level II, because at the applicable time of Riley's tour Herron was in "lock-down." Moreover, Herron maintains that the appellees have withheld documents which would disprove Riley's testimony. From our review of the record, we are satisfied that the district court's factual conclusion that Riley saw Herron in Level II is not clearly erroneous.
 
 
 19
 Testimony before the magistrate established that Herron has participated in a number of escapes and attempted escapes, that he used firearms in all of these escapes and attempted escapes, and that he is serving seven life sentences. Evidence was presented concerning Herron's escape in Boone County, which led to his initial assignment to the SMF; an incident where he and another inmate took three officers hostage in the diagnostic center of the MSP in July 1981, in which two firearms were involved; an escape that took place after he had been transferred to a medical facility in Kentucky involving a weapon; an escape in St. Charles County in which he used a dummy pistol; and an incident inside the MSP where Herron was found to have manufactured two dummy pistols from soap. (Tr. 97-99). Warden Armontrout testified that, in light of his multiple life sentences, Herron is an escape risk and must be contained very closely, (Tr. 97), and that Herron's transfer to Level II was simply a mistake that he corrected, (Tr. 95). Armontrout also testified that Level I was not used only for serious violations of institutional rules, but also for safety and security, or for severe protective custody cases involving high escape risk. (Tr. 63).
 
 
 20
 Dale Riley, Assistant Director of the Division of Adult Institutions, described Level I as a modern design with an observation bubble or security control area in each wing where an officer can visually observe all cell doors. The locked doors are controlled from that unit. In contrast, Level II and III are older cell units and there is no comparison with Level I in terms of providing security and observation. (Tr. 120).
 
 
 21
 We are satisfied that the statute and regulations at issue contain neither "particularized substantive standards" to guide decisionmakers, Nash, 781 F.2d at 668, nor "mandatory language requiring decisionmakers to act in a certain way," id, which would be applicable to an inmate already assigned to administrative segregation. See Williams, 852 F.2d at 378-79 (holding that regulations 20-121.010, 20-121.040, and 20-212.060 did not "contain substantive criteria for the committee to use when deciding whether to reclassify an inmate; they merely establish procedures").
 
 
 22
 We conclude that the district court did not err in adopting the magistrate's conclusion that Herron's reassignment was simply a change of housing from a less restrictive to a more restrictive environment within administrative segregation and therefore did not violate his due process rights.
 
 II.
 
 23
 Following the first oral argument in this case, Herron submitted a pro se application praying for an injunction ordering that: (1) MSP officials return his privileges to a level consistent with the privileges provided in Phase III of the Special Management Facility at Potosi Correctional Center; (2) his case be remanded for additional discovery; and (3) the United States Department of Justice Civil Rights Division enter his case. In response to this application we asked for responses from appellees and Herron's counsel, and heard oral argument.
 
 
 24
 The factual record before us, however, is not such that we can grant relief on these claims. They have not been presented to the district court for consideration, and we generally do not decide issues that have not been raised below. See Young v. Lockhart, 892 F.2d 1348, 1354 (8th Cir.1989). In essence, we believe that these claims raise entirely different issues. Moreover, we recognize that a grievance system, certified by the United States Department of Justice, now exists at the MSP and that Herron should present his new claims to that body. If Herron does not believe that these claims have been satisfactorily resolved by that body, our opinion is without prejudice to their later assertion in district court.
 
 III.
 
 25
 We affirm the order of the district court dismissing Herron's claim, and deny Herron's pro se motion for injunctive relief without prejudice.
 
 
 26
 HEANEY, Senior Circuit Judge, dissenting.
 
 
 27
 I respectfully dissent. In my view, Herron has clearly demonstrated that he had a liberty interest in remaining in Level II of the special management facility and that he was denied due process in being reassigned to Level I without cause and without a due process hearing.
 
 
 28
 There is little or no support in the record for the trial court's finding that the reassignment of Herron from Level II to Level I was simply a change in housing. The plain fact is that residents of Level I are subjected to several restrictions which are not applied to residents of Level II. These include: severe limitations on visitors and phone calls, no radios, and very little personal property. It is equally clear that not a single person has escaped from the special management unit, whether confined in Level I, II, or III. Indeed, Warden Armontrout testified that all units are equally secure.
 
 
 29
 Under these circumstances, I find it very difficult to defend the district court's decision that the reassignment was administrative rather than punitive. It seems quite clear to me that Warden Armontrout has decided that he intends to confine Herron in Level I until "Herron's hair is as gray as" his to punish Herron for his earlier escape attempt, an act for which a punishment was previously assessed. We are not bound by nuances in nomenclature. We must, rather, look to substance in determining what process is due an inmate. See McKinnon v. Patterson, 568 F.2d 930, 937 (2d Cir.1977), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Here, the record demonstrates that the reassignment to Level I was punitive in nature. This being the case, Herron was denied due process, because he did not receive a written notice of charges, a pre-reassignment hearing attendant with witnesses, or a written statement of the evidence relied on. See Wolff v. McDonnell, 418 U.S. 539, 564-70, 94 S.Ct. 2963, 2978-82, 41 L.Ed.2d 935 (1974).
 
 
 30
 The distinction between punitive and administrative actions is not always clear. Jones v. Mabry, 723 F.2d 590, 594 (8th Cir.1983). Generally, punitive action is imposed for past misconduct and administrative action looks to the present and future rather than to the past. Id. This definition of the difference is of little help because administrative determinations that specific action is required for prison security or safety will almost always be based on some past conduct. Courts apply the following standards to distinguish punitive and administrative actions:
 
 
 31
 A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' Thus, if a particular condition or restriction of ... detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon [inmates]. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.
 
 
 32
 Bell v. Wolfish, 441 U.S. 520, 538-39, 99 S.Ct. 1861, 1873-74, 60 L.Ed.2d 447 (1979) (citations omitted); Jones v. Mabry, 723 F.2d at 594.
 
 
 33
 Applying this standard to this case, in my view, calls for a holding that the reassignment was punitive rather than administrative.
 
 
 34
 Assuming for the sake of argument that Herron's transfer to Level I was an administrative one, Herron was nonetheless entitled to at least an informal, nonadversarial review in which he should have received an opportunity to submit a statement and in which the reasons for his transfer should have been set forth. Although Herron was called into the office after he was reassigned to Level I, it appears from the record that he was simply told at that time that he had been reassigned because of his past escapes. This is not a hearing in any sense of the word. It is simply a decision by the warden that no matter what, he intended to keep Herron in Level I for the duration of his sentence and to do so because of his attempts to escape in the past, none of which was from the special management unit and all of which occurred while he was being transferred.
 
 
 35
 One of the unanticipated and unfortunate consequences of Wolff v. McDonnell has been the tendency of prison administrators to label disciplinary actions administrative rather than punitive to avoid having to comply with the due process requirements of Wolff. I believe that is precisely what happened in this case. The committee responsible for determining where best to place Herron to maintain prison discipline and security determined after careful study that Herron should be assigned from Level I to Level II and then to Level III. Dave Reilly, assistant director of the division of adult corrections, and Warden Armontrout overruled that decision. They simply decided that Herron should be reassigned to Level I, a level no more secure than Level II, but a level in which he would be denied prison privileges, and if one is to believe Armontrout, permanently.
 
 
 36
 I would reverse and remand with direction that the district court enter an order requiring the warden to reassign Herron to Level II. What happens after such reassignment obviously depends on Herron's behavior in prison.
 
 
 
 [1]
 We are concerned in this appeal with only Herron's claim
 
 
 [2]
 The Honorable Scott O. Wright, United States District Court Judge for the Western District of Missouri
 
 
 [3]
 The Honorable William A. Knox, United States Magistrate for the Western District of Missouri
 
 
 [4]
 This statute was rewritten and replaced by Mo.Rev.Stat. Sec. 217.375 (Supp.1989). For our purposes we consider the statute as it existed at the time of Herron's reassignment
 
 
 [5]
 Regulation 20-212.060 became effective October 29, 1985 and was modified on March 17, 1986. This regulation was rewritten and replaced by regulation 20-212.040 on January 12, 1987. (Tr. 59-60). We refer to the version of regulation 20-212.060 effective March 17, 1986, throughout because it was in effect when Herron was returned to Level I