**Charles A. MURRAY, Appellant,**

v.

**Gerald LEYSHOCK, Appellee.**

**No. 89–2074.**

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1990.

Decided Oct. 3, 1990.

Robert H. Pedroli, Clayton, Mo., for appellant.

Julian L. Bush, St. Louis, Mo., for appellee.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and BRIGHT, Senior Circuit Judge.

MAGILL, Circuit Judge.

Plaintiff, Charles A. Murray, appeals the United States Magistrate's [1] order granting St. Louis policeman Gerald Leyshock's motion for judgment notwithstanding the jury verdict (JNOV) on Murray's state law negligence claim.[2] The magistrate concluded that because Leyshock was involved in discretionary conduct at the time of Murray's injury, Missouri's official immunity doctrine barred Murray's recovery as a matter of law.[3] We affirm.

---

1. The Honorable William S. Bahn, United States Magistrate for the Eastern District of Missouri. Pursuant to 28 U.S.C. § 636(c)(1) (1988), the parties consented to the entry of judgment by a magistrate.

2. The jury found in favor of Leyshock on Murray's claim under 42 U.S.C. § 1983 (1982). Leyshock had removed this case from state court based on this claim. Murray abandoned a punitive damages claim before jury submission.

3. Leyshock also argued to the magistrate in his motion for a directed verdict and subsequent motion for judgment notwithstanding the verdict that he owed no particularized duty to Murray as a bystander and therefore Missouri's public duty doctrine was applicable. Murray argued that a special relationship (i.e., custody) existed, giving rise to a particularized duty. Although the magistrate discussed, and both parties briefed on appeal the public duty doctrine, in granting Leyshock's motion for judgment notwithstanding the verdict, the magistrate found only that Leyshock had official immunity. We thus need not reach the public duty issue, but only the state immunity issue.

## I.

On October 15, 1985,[4] several police officers executed a search warrant for drug activity at a house in St. Louis. Although they saw a man at a window in the house, there was no response when they knocked. The officers then broke down the door. Detective Leyshock entered first with drawn pistol. Several other police officers followed. Upon seeing Murray in a front room, Detective Leyshock ordered him to place his hands against a refrigerator and "assume the position," with his feet spread behind him. Leyshock, while standing directly behind Murray, placed his left hand on Murray's shoulder while holding the gun in his right, and instructed Murray not to move. Then he began to search Murray's person.

According to Murray, within seconds a large, extremely dangerous, half-wolf, half-Belgian shepherd dog charged out of a dark hallway into the room and attacked Detective Leyshock. The guard dog rushed at Leyshock from between the spread-eagled legs of Murray, and bit Leyshock on the inner thigh. From a twelve-inch distance and with no opportunity to evade, Leyshock fired his gun once at the attacking dog's head and shoulders. The dog retreated from between Murray's legs in response. The guard dog then attempted to lunge at Leyshock a second time after the bite. Leyshock fired again at the animal. One of these shots grazed the dog's muzzle and struck Murray in the calf of the left leg. Leyshock shot a third time at the attack dog as it retreated down the hallway.

Murray brought suit against Detective Leyshock, alleging excessive use of force in violation of 42 U.S.C. § 1983 (1982) and negligence in violation of Missouri law. At trial, Murray introduced evidence of the St. Louis Police Department's official policy concerning the discharge of firearms.[5] A representative of the police department also testified, on Murray's behalf, that while at the Police Academy, cadets are taught to sight a weapon on the target before firing. The representative further testified that cadets are taught not to shoot negligently, and that shooting negligently violated police procedure. No specific procedure was introduced into evidence on this point. Detective Leyshock admitted at trial that although he had aimed his weapon at the attack dog's head, he did not sight the weapon before firing.

The jury found against Murray on the § 1983 claim, but ruled in his favor on the state law negligence claim. Leyshock then moved for a judgment notwithstanding the verdict on the state law claim, arguing that the magistrate erred in refusing to grant his motion for a directed verdict on the ground that Leyshock was protected by official immunity.[6] The magistrate agreed and granted the JNOV, holding that under Missouri law Leyshock had official immunity because he was engaged in discretionary conduct when he shot at the guard dog. The magistrate then entered judgment nunc pro tunc in favor of Leyshock on both the § 1983 and the state law negligence claims.

## II.

■ In reviewing the magistrate's grant of JNOV on the facts, we apply the same standard as the magistrate would have applied in the first instance. *Morgan v. Arkansas Gazette*, 897 F.2d 945, 948 (8th Cir.1990) (citing *Cleverly v. Western Elec. Co.*, 594 F.2d 638, 641 (8th Cir.1979) (per curiam)). In this case, based on the facts found and inferences therefrom in Mur-

---

4. Because we must consider the evidence in the light most favorable to the party prevailing on the jury verdict, we adopt Murray's version of the facts. *See infra* pp. 1198–99.

5. The pertinent portion of the police manual, Rule 9.400, states: "Firearms are to be discharged in the proper performance of police duty only under the following circumstances:

... (b) to destroy seriously injured or dangerous animals when no other method is practical;...." This is the only formal police department policy governing the discharge of firearms. Tr. at 2:4–5.

6. Leyshock's other arguments are not relevant to this appeal.

ray's favor,[7] the magistrate ruled as a matter of law that Missouri law supported Leyshock's claim of official immunity. While we adopt Murray's version of the facts, our standard of review on the Missouri immunity issue is de novo. *Sanders v. Woodruff,* 908 F.2d 310, 313 (8th Cir. 1990); *see also O'Donnell v. Yanchulis,* 875 F.2d 1059, 1063–64 (3d Cir.1989) (reviewing de novo district court's determination of state official immunity as a matter of law).

Where state immunity law is at issue, "it is our practice to defer to the state law ruling of a federal district court sitting in the state whose law is controlling." *Economy Fire & Casualty Co. v. Tri-State Ins. Co.,* 827 F.2d 373, 375 (8th Cir.1987); *accord Pony Express Cab & Bus, Inc. v. Ward,* 841 F.2d 207, 209 (8th Cir.1988). Furthermore, in such instances "it is the duty of the federal court to examine the state law and apply it as it anticipates the highest court of the state would." *Economy Fire & Casualty Co.,* 827 F.2d at 375. We will depart from the lower court's state law interpretation only if it is "fundamentally deficient in analysis, without a reasonable basis, or contrary to reported state court opinion." *Id.*

Murray contends on appeal that the magistrate erred in granting Leyshock's JNOV motion on the basis of official immunity, because the police officer's actions were ministerial rather than discretionary, and thus not within the scope of the official immunity doctrine. We review this claim de novo and disagree. We hold that under Missouri law, Detective Leyshock was engaged in discretionary conduct when he discharged his weapon, and therefore official immunity protects him from civil liability for any negligent acts.

■ Under Missouri law, the official immunity doctrine holds that "a public official

is not civilly liable to members of the public for negligence strictly related to the performance of discretionary duties." *Green v. Denison,* 738 S.W.2d 861, 865 (Mo.1987). An issue that often arises in official immunity cases is whether the public official was engaged in discretionary or ministerial conduct when the alleged negligence occurred. Discretionary conduct involves "the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued," whereas ministerial conduct involves an act "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Rustici v. Weidemeyer,* 673 S.W.2d 762, 769 (Mo.1984); *see also State ex rel. Barthelette v. Sanders,* 756 S.W.2d 536, 537 (Mo.1988) (quoting *Rustici* ). In *Kanagawa v. State ex rel. Freeman,* 685 S.W.2d 831 (Mo.1985), after characterizing the above definitions as "useful guidelines," the Missouri Supreme Court concluded that

> in the final analysis the decision as to whether a public official's acts are discretionary or ministerial must be determined by the facts of each particular case after weighing such factors as the nature of the official's duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment, and the likely consequences of withholding immunity.

*Id.* at 836.

Under the well-established Missouri official immunity doctrine, it is highly improbable that the Missouri Supreme Court would have allowed Murray's state law negligence claim to go to a jury as a matter of law. *See Barthelette,* 756 S.W.2d at 539

---

7. With respect to the underlying facts, this standard requires a reviewing court to: (1) consider the evidence in the light most favorable to Murray, who prevailed with the jury; (2) assume the jury resolved all evidentiary conflicts in Murray's favor; (3) assume as proved all facts which Murray's evidence tends to prove; (4) give Murray the benefit of all favorable inferences which

may reasonably be drawn from the facts proved; and (5) affirm the granting of the JNOV if reasonable persons could not differ as to the conclusions to be drawn from the evidence. *Arkansas Gazette,* 897 F.2d at 948 (citing *Gilkerson v. Toastmaster,* 770 F.2d 133, 136 (8th Cir. 1985)).

(approving dismissal for failure to state a cause of action where official immunity existed as a matter of law); *Green,* 738 S.W.2d at 866 (concluding that police officers in shootout had official immunity and sustaining the trial court's granting of a JNOV); *State ex rel. Twiehaus v. Adolf,* 706 S.W.2d 443, 449 (Mo.1986) (holding that official immunity existed as a matter of law on the facts presented and granting dismissal).

■ Murray argues that although Detective Leyshock's decision to discharge his weapon may be discretionary, the aiming of a weapon is ministerial conduct not protected by official immunity. Applying the definition quoted above, sighting a weapon on a target is not ministerial conduct. It certainly is not an act of a "clerical nature," nor is it one of the few non-clerical ministerial acts. *See Johnson v. Carthell,* 631 S.W.2d 923, 927–28 (Mo.Ct.App.1982) (concluding that bus drivers perform a ministerial function). Murray's major contention is that sighting a weapon is prescribed conduct, performed in obedience to a legal mandate. In support of his argument, Murray cites the rules, policies, and procedures of the St. Louis Police Department and the St. Louis Police Academy. The only formal rule on record is Rule 9.400, which governs when police officers may discharge their weapons.[8] Detective Leyshock clearly complied with this rule— he fired his weapon to destroy an animal which Murray admitted was "extremely dangerous."

The policies and procedures on which Murray so heavily relies are merely instructional techniques from the police academy and other informal practices. Murray argues that the police representative's testimony that an officer could be reprimanded for firing negligently means a legal mandate exists that requires police officers to sight a target in all instances before firing. One problem with this argument is that the police representative's and Murray's use of the phrase "shooting negligently," and its variants, is not the same as failure to sight the weapon. A second

problem with these academy training techniques is that they do not appear to be "designed to apply to a stressful situation, in which immediate action might be necessary to protect lives." *Green,* 738 S.W.2d at 867 (footnote omitted). A third problem is that the instructional techniques and informal practices, under Missouri law, would be considered directory rather than mandatory because they merely describe how a firearm should be discharged without prescribing the consequences for failure to use the correct technique. *See Norton v. Smith,* 782 S.W.2d 775, 778 (Mo.Ct. App.1989). By attempting to bootstrap training practices into prescribed, official procedures, Murray admits one major weakness in his case, namely the lack of a legal mandate that would make sighting a weapon ministerial conduct. By his appeal, Murray is asking this court to create that legal mandate for him. This we will not do because we believe the magistrate properly determined that Detective Leyshock enjoyed official immunity as a matter of law.

Applying the relevant definitions, sighting a weapon on the target is discretionary conduct. Under *Green,* official immunity exists because sighting the weapon is clearly "strictly related" to what Murray admitted was the discretionary function of discharging a weapon. *Green,* 738 S.W.2d at 865. Detective Leyshock, when faced with the attack of a dangerous guard dog, had to use his discretion in deciding whether to fire at the dog and how to fire. Detective Leyshock's judgment informed him there was not enough time to sight his weapon at the guard dog, but he was able to aim at the dog, which was directly in front of him only a foot away. As in the *Green* case, here Murray is asking the court "to second-guess the officer[ ] based on [a] post-mortem analysis of good police practice." *Id.* at 866. The Missouri Supreme Court responded to this by stating: "The doctrine of official immunity was established to protect public officials from just this kind of second-guessing. This is so even though hindsight may demonstrate errors in judg-

8. *See supra* note 5.

ment which might be branded as negligent by qualified evaluators." *Id.*

■ The "final analysis" the *Kanagawa* court promulgated also supports the magistrate's determination that Detective Leyshock possessed official immunity. The nature of police work is well-known. By participating in a drug raid, Detective Leyshock entered into a situation of great tension. *See Green*, 738 S.W.2d at 865. If Leyshock had waited long enough to sight his weapon, the attack dog might had disabled him, endangering Leyshock and the other officers present. As the Missouri Supreme Court observed in *Green*: "[T]here might be danger in delay,...." *Id.* at 865. The next *Kanagawa* consideration, whether the act involves professional expertise and judgment, is satisfied. Sighting a gun on a target involves instruction and practice, and the shooter's judgment is required to determine when target acquisition is sufficient for shooting. In this case, Leyshock's aiming without sighting was sufficient for him to decide to shoot. Finally, the likely consequences of withholding immunity in this situation are calamitous. The Missouri Supreme Court has made explicit the central policy underlying the official immunity doctrine: "[S]ociety's compelling interest in vigorous and effective administration requires that the law protect those individuals who, in the face of imperfect information and limited resources, must daily exercise their best judgment in conducting the public's business." *Barthelette*, 756 S.W.2d at 538 (citing *Kanagawa*, 685 S.W.2d at 836). If immunity were withheld from Detective Leyshock, the effect would be to lessen the effectiveness of law enforcement and unreasonably endanger individuals in situations that are already dangerous enough. If forced to ensure complete target acquisition in every possible situation, police officers might be less willing to raid crack houses or challenge armed criminals because of the extra moment it would require to ensure "proper target acquisition." Again, to paraphrase the Missouri Supreme Court, where there is delay, there is danger. This is not to say that officers should not sight their weapons when possible. But it will not be possible every time, and in those situations when it is not possible, such as this one, we must rely on the officers' use of their best judgment. It is precisely this judgment the official immunity doctrine is designed to protect.

We find that the magistrate's interpretation of the Missouri official immunity doctrine is not fundamentally deficient in analysis, was not without a reasonable basis, and was not contrary to reported state court opinion. Accordingly, we affirm.

## III.

As a matter of law, the doctrine of official immunity barred any recovery against Detective Leyshock because he was involved in discretionary conduct when he injured Murray. Therefore, the magistrate properly granted Leyshock's motion for a JNOV on the state law negligence claim. We affirm the entry of judgment.

JOHN R. GIBSON, Circuit Judge, concurring specially.

I concur fully in Judge Magill's opinion for the court but write specially because of my concern with the dissent. As a product of Missouri legal traditions, I came to know "Old Drum" many years ago. I can only say that the half-wolf, half-German shepherd that attacked Officer Leyshock, "Lobo," was no "Old Drum."

BRIGHT, Senior Circuit Judge, dissenting.

I dissent.

This is a fact-oriented case. I read the facts as sufficient to support the jury verdict. The majority and the magistrate who presided read the facts of record from a different perspective.

In overturning the verdict, the magistrate stated:

The evidence as introduced in the testimony in this case indicates that officer Leyshock discharged his weapon in order to protect himself from an attacking dog. Plaintiff's version of the incident was without corroboration; defendant pro-

duced several supportive witnesses. As such, the officer's conduct would constitute discretionary action and would protect him from owing bystanders a particularized duty under the decision as rendered in *Green v. Denison*, [738 S.W.2d 861 (Mo.1987) (en banc)].

Order at 3.

The magistrate thus injected himself into the case as a fact finder. He usurped the jury's responsibility for determining witness credibility and rejected facts supporting the verdict for the plaintiff. As a consequence, the magistrate's interpretation of Missouri law warrants no deference from this court. In adopting the defendant's version, the magistrate incorporated improper factual considerations into his analysis and thereby rendered his legal interpretation meaningless.

The majority, albeit with more elaboration than the magistrate, has likewise engaged in fact finding, rather than accepting the jury's verdict. Although giving lip service to the standard that, on review, this court must view the facts and inferences in the light most favorable to the plaintiff who succeeded in obtaining the jury's favorable verdict, the majority in essence adopts the police version of the incident.

I must note and emphatically disagree with the apparent linchpin of the majority decision that officer Leyshock suffered a repeated attack from an "extremely dangerous ... dog" and had "no opportunity to evade." *See supra* p. 1198. In this writer's view, the testimony and inferences favorable to the verdict entitled the jury to view the dog, Lobo, not as a dangerous animal, but as a noble one,[1] who acted to protect his master's household from intruders who violently broke into the home and acted as reckless aggressors upon entry. The material facts in the record, which the majority essentially disregards, are related below as follows:

With no advance warning, tr., vol. I, at 15, 51–52, Detective Leyshock of the St. Louis Metropolitan Police Department smashed open the door of a ghetto residence with a sledgehammer, tr., vol. II, at 69, 72. Although Detective Leyshock and the officers accompanying him possessed a

---

1. The jury might have determined that Lobo merely acted as an ordinary watch dog, properly protective of his master's home. Accordingly, this case calls to memory another Missouri case, one concerning a fabulous hunting dog named "Old Drum." In 1869, Charles Burden, Old Drum's owner, sued his neighbor and brother-in-law, Leonidas Hornsby, alleging that Hornsby unlawfully shot and killed Old Drum. George Graham Vest, later a United States Senator, represented Burden at the trial in the old courthouse in Warrensburg, Missouri. In his closing argument to the jury, Vest delivered what was destined to become a classic of American oratory, the speech known to generations of schoolchildren as "Vest's Eulogy to the Dog."

Gentlemen of the Jury: The best friend a man has in this world may turn against him and become his enemy. His son or daughter that he has reared with loving care may prove ungrateful. Those who are nearest and dearest to us, those whom we trust with our happiness and our good name, may become traitors to their faith. The money that a man has he may lose. It flies away from him, perhaps when he needs it most. A man's reputation may be sacrificed in a moment of ill-considered action. The people who are prone to fall on their knees to do us honor when success is with us may be the first to throw the stone of malice when failure settles its cloud upon our heads. The one absolutely unselfish friend that a man can have in this selfish world, the one that never deserts him, the one that never proves ungrateful or treacherous, is his dog. Gentlemen of the jury, a man's dog stands by him in prosperity and in poverty, in health and in sickness. He will sleep on the cold ground, where the wintry winds blow and the snow drives fierce, if only he may be near his master's side. He will kiss the hand that has no food to offer; he will lick the wounds and sores that come in encounter with the roughness of the world. He guards the sleep of his pauper master as if he were a prince. When all other friends desert he remains. When all riches take wings and reputation falls to pieces, he is as constant in his love as the sun in its journey through the heavens. If fortune drives the master forth an outcast in the world, friendless and homeless, the faithful dog asks no higher privilege than that of accompanying to guard against danger, to fight against his enemies, and when the last scene of all comes, and death takes the master in his embrace and his body is laid away in the cold ground, no matter if all other friends pursue their way, there by his graveside will the noble dog be found, his head between his paws, his eyes sad but open in alert watchfulness, faithful and true even in death.

1943–44 *Official Manual State of Missouri* 1129.

warrant to search the premises, the scope of their authority was limited to looking for illegal drugs. *Id.* at 117. Upon effecting entry, Detective Leyshock encountered Murray, a visitor at the residence, in a narrow entry hallway. Tr., vol. I, at 14–16.

Detective Leyshock, with weapon drawn, ordered Murray to assume a search position up against a refrigerator in the hallway. *See* Tr., vol. I, at 17–18. Detective Leyshock then kicked Murray's feet back, requiring Murray to support himself with his hands. *Id.* Intermingling his instructions with profanity, Detective Leyshock ordered Murray not to move. *Id.* at 18. Detective Leyshock then proceeded to conduct a pat search for weapons, tr., vol. II, at 50, which presented sufficient time for Detective Leyshock to remove Murray's wallet from his back pocket, tr., vol. I, at 18.

While being searched, Murray noticed the approach of Lobo, a large Belgium Shepherd. *Id.* at 19. Murray knew Lobo to be a good watch dog with respect to intruders to the household and therefore attempted to warn Detective Leyshock of the potential danger. Tr., vol. I, at 18–20. Detective Leyshock responded by swearing at Murray to shut up. *Id.* at 19.

As a consequence, Lobo continued down the hallway, entered a space in front of the refrigerator and lunged toward Detective Leyshock from between Murray's legs. *Id.* at 19. Detective Leyshock fired two shots in rapid succession between Murray's legs, striking Murray in the rear of the left calf. *Id.* at 20, 23. For at least one of these shots, Detective Leyshock fired without aligning the gun's sights with his target, tr., vol. II, at 54, 64, and without knowing where the weapon pointed, *id.* at 51–53, 65–67. As Lobo retreated, Detective Leyshock moved back, turned to the side and fired a third shot down the hallway. Tr., vol. I, at 34. The record is inconclusive as to whether any of Detective Leyshock's bullets struck Lobo, tr., vol. I, at 82–84, who was neither yelping nor visibly injured as he ran away, *id.* at 26–27.

When Murray attempted to apprise Detective Leyshock of his injury, Detective

Leyshock responded: "Shut up. You aren't hit." Tr., vol. I, at 23. Another officer subsequently pointed out that Murray had a shoe full of blood and ordered Murray to go to another room and lie face down. *Id.* at 24. Detective Leyshock neither looked at Murray's wound, tr., vol. II, at 67, nor offered Murray any assistance, tr., vol. I, at 24, so Murray was forced to hobble there under his own power, *id.* The officers waited ten minutes before calling an ambulance. *Id.* About the same time, supervisory personnel entered the room and relieved Detective Leyshock of his weapon. *Id.*

When the ambulance arrived, the officers handcuffed Murray to the gurney. *Id.* When Murray asked to know the charges against him, the officers responded that Murray was required to go down to the station for questioning. *Id.* at 25. Murray was then taken to the hospital, where, in the presence of the officers, hospital staff hurriedly bandaged his wounds and released him without pain medication or antibiotics. *Id.* at 25–26.

The officers then took Murray to the police station, even though he was neither charged with a crime nor under arrest. *Id.* at 26, 28. At the station, the police informed Murray that he had been struck by a bullet ricocheting from the dog's nose. *Id.* at 26. At that time, Detective Leyshock showed Murray a mark on his leg, which he claimed was a dog bite. *Id.* at 27. At the time of the incident, however, Detective Leyshock neither jumped back nor gave any other indication of being in pain. Tr., vol. I, at 33, 54. Murray was required to make his own arrangements for a ride home from the police station. *Id.* at 28.

At trial, Murray called Officer Michael Dunn, the official designee of the St. Louis Metropolitan Police Department for testimony about the Department's firearm policies. Tr., vol. II, at 3–4. With respect to the Department policy on the authorized use of firearms, Murray's counsel elicited the following testimony from Officer Dunn:

Q [I]sn't it taught to the police officers [at the police academy] that when they

pull the trigger, they should know where the weapon is pointed?

A Yes, sir.

Q And that falls within the target acquisition and aiming of the weapon procedures, police procedures, is that right?

A Yes, sir, I believe it would.

Q The fact the police officers, they are taught straight out, "you don't fire your gun unless you know where it's aiming," and that's basic marksmanship, is that correct?

A Yes, it is.

Q And police officers are taught site [sic] alignment, trigger control, how to grip the pistol, how to position the pistol, and target acquisition, is that right?

A Yes, sir.

Q . . .

A police officer can be orally reprimanded or reprimanded in writing for firing a shot and hitting the wrong target, is that correct?

A Yes, he could be.

Q And they could also be disciplined at the time of the incident for a negligent shot, is that correct?

A That's correct.

Tr., vol. II, at 7–8.

In addition, Officer Dunn testified that, as a part of the basic training curriculum, police officers were taught to use movement and cover as an alternative to firing where tactically possible, and that the basic training curriculum comprised a part of the police procedures. *Id.* at 10. Further, Officer Dunn acknowledged that police officers could violate police procedure by shooting negligently, even where the decision to shoot was authorized by a police department policy. *See id.* at 7, 9. Moreover, Officer Dunn specifically testified that an officer who fired negligently in an attempt to destroy an animal would violate police procedures, *id.* at 9, and that officers could be disciplined for violating police procedures, *id.* at 10.

In Missouri, public officers are liable to private individuals for injuries caused by the negligent performance of a ministerial duty. *Kanagawa v. State ex rel. Freeman,* 685 S.W.2d 831, 835 (Mo.1985) (en banc); *Rustici v. Weidemeyer,* 673 S.W.2d 762, 769 (Mo.1984) (en banc). Under Missouri law, ministerial duties encompass a variety of activities that public officials are required to perform in a regular and prescribed manner. *See Kanagawa,* 685 S.W.2d at 836 (prison security personnel's performance of routine security functions is ministerial function); *Rustici,* 673 S.W.2d at 767 (police officer's warrantless arrest is ministerial function); *Johnson v. Carthell,* 631 S.W.2d 923, 927–28 (Mo.Ct. App.1982) (school bus driver's manner of maintaining order is ministerial function). In addition, the duty to perform ministerial functions non-negligently extends to oral communications. *See Larabee v. Kansas City,* 697 S.W.2d 177, 180 (Mo.Ct.App.1985) (public official liable for damage caused by negligent disregard of oral instructions in demolishing building).

In this case, the jury had ample basis to infer that Detective Leyshock negligently performed a ministerial function. The testimony of supervisory police personnel indicated that only a matter of life and death would justify a decision to discharge a weapon between a human being's legs. *See* tr., vol. II, at 149–50. By his own admission, Detective Leyshock did not fire in defense of his life. Tr., vol. II, at 58. Moreover, Detective Leyshock's conduct in discharging his weapon without aligning the sights or knowing where it pointed contravened police academy training. Contrary to the majority's assertion, this training was not merely "instructional techniques" and "informal practices," *see supra* p. 1200, but rather constituted a part of the Police Manual, tr., vol. II, at 91. Thus, according to the evidence for Murray, Detective Leyshock fired negligently and in violation of the Department's routine and proscribed procedures for the discharge of a weapon. Under the Police Department's representations of its own policies, such a negligent firing could have resulted in disciplinary action against Detective Leyshock. As such, the Department's policies were not, as the majority asserts, merely directory. *See Norton v. Smith,* 782 S.W.2d 775, 777 (Mo.Ct.App.

1989); *Hedges v. Department of Social Servs.*, 585 S.W.2d 170, 172 (Mo.Ct.App. 1979).

In addition, the jury had reason to reject what is, in essence, the foundational underpinning of the majority's position: that Detective Leyshock fired pursuant to a police department policy permitting the discharge of weapons to destroy dangerous animals. *See* discussion *supra* pp. 1200–1201. In fact, for all practical purposes, the jury in this case did reject the majority position when they returned a verdict for Murray and not Detective Leyshock. Significantly, at trial, Detective Leyshock expressly testified that the policy permitting destruction of dangerous animals motivated his conduct. Tr., vol. II, at 57–58. Other evidence, however, showed that Lobo was friendly to invited guests, tr., vol. I, at 40, and that neither Detective Leyshock nor the other officers present subsequently attempted to destroy the dog, *id.*, vol. II, at 59–60. Moreover, if Detective Leyshock had not been (1) rude, and (2) engaging in a legally questionable search of Murray's personal effects, he might have received sufficient warning of the approaching animal to obviate any perceived need for discharging his weapon.

Further, the majority's concern for the safety of officers conducting the search, *see supra* p. 1201, rings hollow under the circumstances presented here. Contrary to the majority's conjecture, neither Lobo nor Murray presented an appreciable threat of disabling Detective Leyshock. Under the facts supporting the verdict, Lobo's shoulders were wedged between Murray's legs, effectively impeding the dog's passage. Tr., vol. I, at 27–28, 43. Moreover, the evidence indisputably indicated that Murray was unarmed and further permitted the inference that Detective Leyshock had sufficient time to confirm this before the dog's approach.[2] Nevertheless, despite the dearth of compelling circumstances, Detective Leyshock opted to discharge his weapon between Murray's legs rather than take a step backward to avoid the dog's lunge. Notably, Detective Leyshock presented this security rationale at trial, tr., vol. II, at 85–86, and the jury apparently rejected it.

This case is distinguishable from *Green v. Denison*, 738 S.W.2d 861 (Mo.1987) (en banc), on which the majority heavily relies. *Green* held that a police officer is not liable to members of the general public for negligently deciding to discharge a weapon while attempting to arrest an armed felon. 738 S.W.2d at 866. In this case, however, Murray was not merely a member of the general public, but rather a specific individual whom Detective Leyshock had immobilized and, at gun point, forbidden to speak, move or take any like action to protect himself. *See Sherrill v. Wilson*, 653 S.W.2d 661, 669 (Mo.1983) (en banc) (officers remain liable for breach of duty owed to particular individuals). Moreover, the issue in this case was not whether Detective Leyshock had discretion to discharge his weapon at all, but whether he could open fire from a position presenting great danger to Murray *and* ignore routine and elementary police safety procedures while shooting.

I cannot believe that police officers in Missouri have discretion to discharge weapons indiscriminately and without regard to the danger to those in their care or custody. Even under *Green*, 738 S.W.2d at 866, "public officials may be required to exercise care to avoid injury to particular individuals, when the injury is reasonably foreseeable and is not an integral part of the officers' action in the line of discretionary duty." Moreover, in *Green*, the Missouri Supreme Court limited the doctrine of official immunity as follows:

> We agree that public officials may be expected to keep their wits about them, and must not assume an attitude of arrogant disregard toward the safety of members of the public. In the present case, however, the breaches of duty assigned are part and parcel of the officers' judgmental decisions. As to this conduct, no particularized duty was owed to the plaintiffs.

738 S.W.2d at 867 (emphasis added).

Viewed most favorably to Murray, the record supports a finding of outrageously

---

**2.** Significantly, in addition to the previously noted evidence of a pat search, Detective Leyshock himself professed to have turned away from Murray while firing. Tr., vol. II, at 40–41.

**1206**

indifferent conduct on the part of Detective Leyshock, whether ministerial or otherwise. Accordingly, the jury could certainly find, under the circumstances presented, that Detective Leyshock's decision to discharge his weapon constituted conduct outside the scope of a police officer's "official immunity." [3]

This case essentially boils down to a credibility dispute between a citizen plaintiff and a defendant police officer. At trial, the jury listened to several witnesses for the defense—all police officers—who testified that Detective Leyshock was attacked by three dogs, not one, and that Detective Leyshock discharged his weapon, not between Murray's legs, but to the side. Clearly, the jury rejected Detective Leyshock's version of events and the supporting testimony by a parade of police personnel.

In my view, this was a case for the jury to decide.[4] The magistrate erred, and this court ought not to approve of the magistrate casting aside the jury's evaluation. Although the factual record does not unquestionably establish Murray's claim, it contains sufficient evidence for reasonable persons to disagree. The majority, therefore, fails to give adequate credence to the fact finder's determination in Murray's favor, and, notwithstanding representations to the contrary, adopts the defendant's version of the case in some crucial aspects.

In this case, my distinguished and able colleagues read the record differently than do I, thereby demonstrating that, even in a fact-oriented case, appellate judges may view the same facts in the record from differing perspectives. As an appellate judge, I prefer a view that supports a jury verdict, notwithstanding that a different

jury or a judge sitting as a fact finder might have reached a contrary conclusion.

Accordingly, I would reverse the magistrate and reinstate the jury verdict.

**3.** The majority points out that the jury did not receive instruction on reckless or indifferent conduct. *See supra* note 8. Nonetheless, Murray's complaint alleged that Detective Leyshock's "negligent, reckless, careless and intentional acts" caused Murray's injuries. Accordingly, Murray's pleadings were sufficient to allege a state law violation under any standard. It was therefore incumbent upon Detective Leyshock to raise an objection to the jury instruction to cure any purported error. Detective Leyshock failed to do so. Consequently, this court can only reverse where the result is

manifestly unjust. Moreover, in the event of a reversal, the proper remedy is retrial on the merits with appropriate instruction, not affirmance of the judgment n.o.v.

**4.** The plaintiff, who was black, initially objected to the venire because all jury members were white. Tr., vol. I, at 2–4. In this case, the plaintiff's misgivings were unwarranted. The jury considered the case on the merits and, in my view, gave a fair trial to both parties.